**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ALAN DORAN, ADMINISTRATOR FOR THE ESTATE OF RACHEL HOPE DORAN (DECEASED),<br><br>                    Plaintiff,<br><br>     v.<br><br>GLAXOSMITHKLINE PLC, ET AL,<br><br>               Defendant. | Case No. _____<br><br><br><br>September 15, 2021 |

**NOTICE OF REMOVAL**

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF CONNECTICUT:

PLEASE TAKE NOTICE that, Defendant GlaxoSmithKline LLC ("GSK LLC") hereby

removes the above-captioned action from the Superior Court of Connecticut for the Judicial

District of Fairfield at Bridgeport to the United States District Court, District of Connecticut,

pursuant to 28 U.S.C. §1332 and §1441.

As set forth more fully below, this case is properly removed to this Court pursuant to 28

U.S.C. § 1441 because GSK LLC has satisfied the procedural requirements for removal and this

Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. As grounds

for removal, GSK LLC states as follows:

**INTRODUCTION**

1.     This is a pharmaceutical product liability case involving lamotrigine, the generic

version of Lamictal®. There is complete diversity of citizenship among all parties in this case and

the amount in controversy exceeds $75,000, exclusive of interest and costs, rendering this action

removable under 28 U.S.C. §§ 1332 and 1441(a)-(b).

2.      Plaintiff Alan Doran, Administrator for the Estate of Rachel Hope Doran, ("Plaintiff") commenced this action entitled *Alan Doran, Administrator For The Estate of Rachel Hope Doran vs. GlaxoSmithKline PLC* in the Superior Court of Connecticut for the Judicial District of Fairfield at Bridgeport by serving GSK LLC with a summons and complaint dated August 12, 2021 on August 17, 2021. A copy of the state court summons and complaint is attached as Exhibit A.

3.      Plaintiff alleges that Rachel Doran ingested lamotrigine – the generic form of Lamictal® – and, as a result, developed Stevens-Johnson Syndrome, Toxic Epidermal Necrolysis, and Hemophagocytic Lymphohistiocytosis. Ex. A ¶ 4. The Complaint further alleges that Rachel Doran suffered from acute respiratory distress syndrome, pneumothorax, renal failure, maculopapular lesions throughout her face, trunk, genitals, and thighs, uncontrollable pain, left cerebellar stroke with hemorrhage, deep vein thrombosis, leukocytosis, lactic acidosis, acute kidney injury, persistent shock, multi-organ failure, pain and suffering, psychological, physiological, neurological, and death sequelae, and death. *Id.* at ¶ 95.

4.      The Complaint alleges one (1) cause of action under the Connecticut Products Liability Act, Conn. Gen. Stat. § 52-572m, *et seq*. ("CPLA"), for innocent, negligent, and/or willful failure to provide adequate warnings and innocent, negligent, and/or willful misrepresentation. *Id.* at ¶¶ 101, 114. Plaintiff seeks an unspecified and unlimited amount of compensatory damages, as well as punitive damages, attorneys' fees, and other relief.

5.      Plaintiff served GSK LLC with the Summons and Complaint through its registered agent on August 17, 2021. GlaxoSmithKline plc ("GSK plc"), the other co-defendant in this action, has not yet been served.

## DIVERSITY JURISDICTION

6.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332. Diversity jurisdiction exists where (1) the suit is between "citizens of different States and in which citizens or subjects of a foreign state are additional parties," and (2) the amount in controversy exceeds $75,000, exclusive of interest and costs. 28 U.S.C. §§ 1332(a)(3); *see also Universal Licensing Corp. v. Paola del Lungo S.p.A.*, 293 F.3d 579, 580–81 (2d Cir. 2002) ("[D]iversity is present when the action is between . . . 'citizens of different States and in which citizens or subjects of a foreign state are additional parties . . . .'") (quoting 28 U.S.C. § 1332(a)(3)).

**I.      There is Complete Diversity of Citizenship Between Plaintiff and Defendants.**

7.      Plaintiff's Complaint alleges that Alan Doran, the Administrator For the Estate of Rachel Hope Doran, resides in Westport, Connecticut. Ex. A ¶ 17. Plaintiff is therefore a citizen of Connecticut for purposes of diversity jurisdiction.

8.      When analyzing diversity jurisdiction, "an LLC is deemed a citizen of every state in which its members are citizens." *Walsh v. Lumivisions Architectural Elements Inc.*, No. 3:15cv1210, 2016 WL 111407, at *2 (D. Conn. Jan. 11, 2016). Further, "a corporation is deemed to be a citizen both of the state in which it has its principal place of business and of any state in which it is incorporated." *Universal Licensing*, 293 F.3d at 581.

9.      Defendant GSK LLC is a limited liability company organized under the laws of Delaware. Ex. A at ¶ 19. Its sole member is GlaxoSmithKline Holdings (America) Inc., a corporation organized under the laws of Delaware with its principal place of business in Wilmington, Delaware. GSK LLC is, therefore, a citizen of Delaware.

10.     Defendant GSK plc is a United Kingdom company with its principal place of business in Brentford, United Kingdom. *Id*. at ¶ 18. Defendant GSK plc is, therefore, a citizen of the United Kingdom.

11.     Because Plaintiff is a citizen of Connecticut and Defendants are citizens of states other than Connecticut and a foreign country, the complete diversity requirement of 28 U.S.C. § 1332 is satisfied.

## II.     The Amount in Controversy Exceeds $75,000.

12.     The amount in controversy requirement of 28 U.S.C. § 1332 is also satisfied.

13.     In accordance with Connecticut General Statute § 52-91(1), the Complaint contains a Statement of Amount in Demand that the amount of money damages claimed is greater than Fifteen Thousand Dollars ($15,000.00), exclusive of interest and costs. However, the Complaint does not set forth a specific damage amount. When "the pleadings are inconclusive, then the courts may look to documents outside the pleadings [or] to other evidence in the record to determine the amount in controversy." *Luo v. Mikel*, 625 F.3d 772, 775 (2d Cir. 2010)

14.     When, like here, a "complaint fails to allege a specific amount of damages, the removing defendant must prove by a preponderance of the evidence that the amount in controversy exceeds $75,000." *Royal Ins. Co. v. Jones*, 76 F. Supp. 2d 202, 204 (D. Conn. 1999). In determining whether the amount in controversy requirement has been satisfied, "[a] court may consider the nature of the claims, factual allegations within the pleadings, and the record outside the pleadings to determine the amount in controversy." *Price v. PetSmart, Inc.*, 148 F. Supp. 3d 198, 201 (D. Conn. 2015) (internal quotations and citations omitted).

15.     "[T]he claims made by the plaintiff, not the likely recovery, control." *McLoughlin v. People's United Bank, Inc.*, 586 F. Supp. 2d 70, 72 (D. Conn. 2008). Indeed, the "'inability of

the plaintiff to recover an amount adequate to give the court jurisdiction ... does not oust jurisdiction. Nor does the fact that the complaint discloses the existence of a valid defense to the claim.'" *Id.* (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938)).

16.     Courts have found that the amount-in-controversy requirement has been satisfied where, as here, a plaintiff alleges serious bodily injury. *See e.g., Hopkins v. Kawasaki Rail Car, Inc.*, 2017 WL 3715247, at *2 (D. Conn. Aug. 28, 2017) (finding that the amount in controversy exceeded $75,000 where the complaint alleged that the plaintiff had suffered extensive injuries); *Burr ex rel. Burr v. Toyota Motor Credit Co.*, 478 F. Supp. 2d 432, 439 (S.D.N.Y. 2006) (holding that there was a "reasonable probability that the claim is in excess of the statutory jurisdictional amount" where, among other things, the complaint alleged that the plaintiff had "suffered serious and severe permanent personal injuries"); *Evans v. CDX Servs., LLC*, 528 F. Supp. 2d 599, 606 (S.D.W. Va. 2007) (holding "that Plaintiffs' claims for 'serious bodily injury,' 'tremendous pain and suffering,' 'loss of earning capacity,' and 'loss of ability to enjoy life'" supported a finding that the defendants had "met their burden of proving by a preponderance of the evidence that Plaintiffs' claims exceed the jurisdictional amount"); *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 298 (5th Cir. 1999) (concluding that district court did not err in finding that personal injury claims exceeded $75,000 where the claimant alleged "damages for property, travel expenses, an emergency ambulance trip, a six day stay in the hospital, pain and suffering, humiliation, and her temporary inability to do housework after the hospitalization."); *Morrow v. Wyeth*, 2005 WL 2621555, at *3 (S.D. Tex. Oct. 13, 2005) (concluding that amount-in-controversy was satisfied in pharmaceutical product liability case where plaintiff alleged "severe injuries," including "serious injuries to his central nervous system").

17.     Plaintiff seeks to recover for alleged personal injuries suffered as a result of ingesting lamotrigine. (*See generally* Complaint). Specifically, Plaintiff avers Rachel Doran developed Stevens-Johnson Syndrome, Toxic Epidermal Necrolysis, and Hemophagocytic Lymphohistiocytosis. Ex. A ¶ 4. The Complaint further alleges that Rachel Doran suffered from acute respiratory distress syndrome, pneumothorax, renal failure, maculopapular lesions throughout her face, trunk, genitals, and thighs, uncontrollable pain, left cerebellar stroke with hemorrhage, deep vein thrombosis, leukocytosis, lactic acidosis, acute kidney injury, persistent shock, multi-organ failure, pain and suffering, psychological, physiological, neurological, and death sequelae, and death. *Id.* at ¶ 95. Plaintiff alleges that as a result of developing Stevens-Johnson Syndrome, Toxic Epidermal Necrolysis, and Hemophagocytic Lymphohistiocytosis she was treated at a walk-in clinic in New York City, Bridgeport Hospital Emergency Room, and Columbia Presbyterian Medical Center. *Id.* at ¶ 90-97. In the course of her treatment at these facilities, she underwent "numerous invasive and painful procedures as part of her diagnosis and treatment." *Id.* at ¶ 96.

18.     The Complaint alleges that "Rachel Doran has been permanently deprived of her ability to carry on and enjoy life's activities;" that "her earning capacity has been permanently destroyed;" and that "[a]s a further result of her death, the Estate of Rachel Doran incurred expenses for medical care and treatment and funeral costs all to its financial loss." *Id.* at ¶¶ 98-99. Plaintiff seeks, among other damages, compensatory damages; punitive damages, which the CPLA provides may be "an amount equal to twice the damages awarded to the plaintiff" (Conn. Gen. Stat. § 52-240b); and attorney's fees. *Id.* at 14-15.

19.     Given the nature of Plaintiff's alleged injuries and claims for damages it is facially apparent from the Complaint that the amount in controversy exceeds $75,000, exclusive

of interest and costs. Thus, the amount in controversy requirement of 28 U.S.C. §1332 is satisfied.

## PROCEDURAL MATTERS FOR REMOVAL

20.     In addition to satisfying the requirements of diversity jurisdiction, GSK has satisfied all other requirements for removal.

21.     Venue is proper in this Court because the United States District Court for the District of Connecticut is the federal judicial district embracing the Superior Court of Connecticut for the Judicial District of Fairfield at Bridgeport, where this action was originally filed.

22.     This Notice of Removal is timely and properly filed pursuant to 28 U.S.C. § 1446(b). Plaintiff served GSK LLC with the Summons and Complaint through its registered agent on August 17, 2021. GSK plc has not yet been served. Accordingly, this Notice of Removal is brought within the time required by 28 U.S.C § 1446(b) because it has been filed within thirty (30) days of service of the Summons and Complaint.

23.     The consent to removal of Defendant GSK plc is not required because it has not been properly served. *See* 28 U.S.C. § 1446(b)(2)(A) (requiring consent only from defendants who have been "properly joined and served" in removed action).

24.     Pursuant to 28 U.S.C. § 1446(a), a copy of the Summons and Complaint served upon GSK LLC, is attached hereto as Exhibit A.

25.     Pursuant to 28 U.S.C. § 1446(d), Notice of Filing of the Notice of Removal will be furnished promptly to Plaintiff and a copy of the Notice will be filed with the Clerk of the Superior Court for the Judicial District of Fairfield at Bridgeport.

26.     By removing this action to this Court, GSK does not waive any defenses, objections, or motions available to it under state or federal laws. GSK expressly reserves the

right to move for dismissal of some or all of Plaintiff's claims and/or seek dismissal based on

lack of personal jurisdiction, improper venue, and/or the doctrine of forum non conveniens.


**WHEREFORE**, defendant GSK LLC hereby removes this civil action to this Court from

the Superior Court of Connecticut for the Judicial District of Fairfield at Bridgeport.


By:     */s/ Timothy P. Jensen (ct18888)*
Timothy P. Jensen (ct18888)
Amy E. Markim (ct27974)
O'Sullivan McCormack Jensen & Bliss PC
180 Glastonbury Boulevard, Ste. 210
Glastonbury, CT 06033
Phone: 860-258-1993
Fax: 860-258-1991
Email: tjensen@omjblaw.com
          amarkim@omjblaw.com

*Attorneys for Defendant*
*GlaxoSmithKline LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 15th day of September, 2021 a copy of the foregoing Notice of Removal was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

I further certify that I have on this day served all counsel of record, as well as all counsel for potentially interested parties, with this filing by depositing in the United States Mail a copy of same in an envelope with adequate postage thereon, addressed as follows:

Joshua D. Koskoff, Esq.
Koskoff Koskoff & Bieder
350 Fairfield Avenue
Bridgeport, CT 06604
jkoskoff@koskoff.com

By:  _/s/Timothy P. Jensen_
      Timothy P. Jensen (ct18888)

# EXHIBIT A

## SUMMONS - CIVIL
JD-CV-1 Rev. 10-15
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a,
52-48, 52-259, P.B. §§ 3-1 through 3-21, 8-1, 10-13

**See other side for instructions**



STATE OF CONNECTICUT
**SUPERIOR COURT**
www.jud.ct.gov

☐ "X" if amount, legal interest or property in demand, not including interest and costs is less than $2,500.

☒ "X" if amount, legal interest or property in demand, not including interest and costs is $2,500 or more.

☐ "X" if claiming other relief in addition to or in lieu of money or damages.

TO: Any proper officer; BY AUTHORITY OF THE STATE OF CONNECTICUT, you are hereby commanded to make due and legal service of this Summons and attached Complaint.

| Address of court clerk where writ and other papers shall be filed *(Number, street, town and zip code)* *(C.G.S. §§ 51-346, 51-350)* | Telephone number of clerk *(with area code)* | Return Date *(Must be a Tuesday)* | | |
|---|---|---|---|---|
| 1061 Main St, Bridgeport, CT 06604 | ( 203 )579-6527 | October | 5 | , 2 021 |
| | | Month | Day | Year |
| ☒ Judicial District    ☐ Housing Session    ☐ G.A. Number: | At *(Town in which writ is returnable) (C.G.S. §§ 51-346, 51-349)*  Bridgeport | Case type code *(See list on page 2)*   Major:  T      Minor:  20 | | |

**For the Plaintiff(s) please enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented *(Number, street, town and zip code)* | Juris number *(to be entered by attorney only)* |
|---|---|
| Koskoff Koskoff & Bieder, 350 Fairfield Avenue, Bridgeport, CT 06604 | 302902 |

| Telephone number *(with area code)* | Signature of Plaintiff *(If self-represented)* |
|---|---|
| ( 203 ) 336-4421 | |

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. | ☒ Yes  ☐ No | Email address for delivery of papers under Section 10-13 *(if agreed to)*  jkoskoff@koskoff.com |
|---|---|---|

| Number of Plaintiffs: 1 | Number of Defendants: 2 | ☐ Form JD-CV-2 attached for additional parties |
|---|---|---|

| Parties | Name *(Last, First, Middle Initial)* and Address of Each party *(Number; Street; P.O. Box; Town; State; Zip; Country, if not USA)* | |
|---|---|---|
| First Plaintiff | Name: Doran, Alan, Administrator For the Estate of Rachel Hope Doran (Deceased)  Address: 5 Maple Lane, Westport, CT 06880 | P-01 |
| Additional Plaintiff | Name:  Address: | P-02 |
| First Defendant | Name: GlaxoSmithKline LLC, 5 Crescent Drive, Philadelphia, PA, 19112  Address: C/O Corporation Service Company, 100 Pearl St,17th Floor, MC-CSC1, Hartford, CT06103 | D-01 |
| Additional Defendant | Name: GlaxoSmithKline plc  Address: 980 Great West Road, Brentford, Middlesex TW8 9GS, United Kingdom | D-02 |
| Additional Defendant | Name:  Address: | D-03 |
| Additional Defendant | Name:  Address: | D-04 |

## Notice to Each Defendant

1. **YOU ARE BEING SUED.** This paper is a Summons in a lawsuit. The complaint attached to these papers states the claims that each plaintiff is making against you in this lawsuit.
2. To be notified of further proceedings, you or your attorney must file a form called an "Appearance" with the clerk of the above-named Court at the above Court address on or before the second day after the above Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to come to court.
3. If you or your attorney do not file a written "Appearance" form on time, a judgment may be entered against you by default. The "Appearance" form may be obtained at the Court address above or at *www.jud.ct.gov* under "Court Forms."
4. If you believe that you have insurance that may cover the claim that is being made against you in this lawsuit, you should immediately contact your insurance representative. Other action you may have to take is described in the Connecticut Practice Book which may be found in a superior court law library or on-line at *www.jud.ct.gov* under "Court Rules."
5. If you have questions about the Summons and Complaint, you should talk to an attorney quickly. **The Clerk of Court is not allowed to give advice on legal questions.**

| Signed *(Sign and "X" proper box)* | ☒ Commissioner of the Superior Court  ☐ Assistant Clerk | Name of Person Signing at Left  Joshua D. Koskoff | Date signed  8/11/21 |
|---|---|---|---|

| If this Summons is signed by a Clerk: | For Court Use Only |
|---|---|
| a. The signing has been done so that the Plaintiff(s) will not be denied access to the courts.  b. It is the responsibility of the Plaintiff(s) to see that service is made in the manner provided by law.  c. The Clerk is not permitted to give any legal advice in connection with any lawsuit.  d. The Clerk signing this Summons at the request of the Plaintiff(s) is not responsible in any way for any errors or omissions in the Summons, any allegations contained in the Complaint, or the service of the Summons or Complaint. | File Date |

| I certify I have read and understand the above: | Signed *(Self-Represented Plaintiff)* | | Date | |
|---|---|---|---|---|

## Instructions

1. *Type or print legibly; sign summons.*
2. *Prepare or photocopy a summons for each defendant.*
3. *Attach the original summons to the original complaint, and attach a copy of the summons to each copy of the complaint. Also, if there are more than 2 plaintiffs or more than 4 defendants prepare form JD-CV-2 and attach it to the original and all copies of the complaint.*
4. *After service has been made by a proper officer, file original papers and officer's return with the clerk of court.*
5. *Do not use this form for the following actions:*

   (a) *Family matters (for example divorce, child support, custody, paternity, and visitation matters).*
   (b) *Summary process actions.*
   (c) *Applications for change of name.*

   (d) *Probate appeals.*
   (e) *Administrative appeals.*
   (f) *Proceedings pertaining to arbitration.*
   (g) *Any actions or proceedings in which an attachment, garnishment or replevy is sought.*

---

### ADA NOTICE
The Judicial Branch of the State of Connecticut complies with the Americans with Disabilities Act (ADA). If you need a reasonable accommodation in accordance with the ADA, contact a court clerk or an ADA contact person listed at *www.jud.ct.gov/ADA*.

---

## Case Type Codes

| Major Description | Codes Major/ Minor | Minor Description | Major Description | Codes Major/ Minor | Minor Description |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 10 | Construction - State and Local | | T 03 | Defective Premises - Private - Other |
| | C 20 | Insurance Policy | | T 11 | Defective Premises - Public - Snow or Ice |
| | C 30 | Specific Performance | | T 12 | Defective Premises - Public - Other |
| | C 40 | Collections | | T 20 | Products Liability - Other than Vehicular |
| | C 90 | All other | | T 28 | Malpractice - Medical |
| Eminent Domain | E 00 | State Highway Condemnation | | T 29 | Malpractice - Legal |
| | E 10 | Redevelopment Condemnation | | T 30 | Malpractice - All other |
| | E 20 | Other State or Municipal Agencies | | T 40 | Assault and Battery |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 50 | Defamation |
| | E 90 | All other | | T 61 | Animals - Dog |
| | | | | T 69 | Animals - Other |
| Miscellaneous | M 00 | Injunction | | T 70 | False Arrest |
| | M 10 | Receivership | | T 71 | Fire Damage |
| | M 20 | Mandamus | | T 90 | All other |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | M 40 | Arbitration | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | M 50 | Declaratory Judgment | | V 05 | Motor Vehicles* - Property Damage only |
| | M 63 | Bar Discipline | | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | | V 09 | Motor Vehicle* - All other |
| | M 68 | Bar Discipline - Inactive Status | | V 10 | Boats |
| | M 70 | Municipal Ordinance and Regulation Enforcement | | V 20 | Airplanes |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | | V 30 | Railroads |
| | M 83 | Small Claims Transfer to Regular Docket | | V 40 | Snowmobiles |
| | M 84 | Foreign Protective Order | | V 90 | All other |
| | M 90 | All other | | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| Property | P 00 | Foreclosure | | | |
| | P 10 | Partition | Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | P 20 | Quiet Title/Discharge of Mortgage or Lien | | W 90 | All other |
| | P 30 | Asset Forfeiture | | | |
| | P 90 | All other | | | |

| | | |
|---|---|---|
| **RETURN DATE:  OCTOBER 5, 2021** | : | **SUPERIOR COURT** |
| | | |
| **ALAN DORAN, ADMINISTRATOR** | : | **JUDICIAL DISTRICT** |
| **FOR THE ESTATE OF RACHEL HOPE** | : | **OF FAIRFIELD** |
| **DORAN (DECEASED)** | : | |
| | | |
| **V.** | : | **AT BRIDGEPORT** |
| | | |
| **GLAXOSMITHKLINE PLC, ET AL** | : | **AUGUST 12, 2021** |

## COMPLAINT

1.     This case is about the premature and tragic death of Rachel Hope Doran and the multi-national corporation that could and should have prevented it

2.     The plaintiff, Alan Doran, Administrator of the Estate of Rachel Hope Doran, brings this action against the Defendants, GlaxoSmithKline PLC and GlaxoSmithKline LLC (collectively, "Glaxo" or "Defendants") for their misleading promotion of their unreasonably dangerous drug Lamictal and its failure to adequately warn of Lamictal's lethal risks.

3.     In December 2017, Rachel Doran was a twenty-year-old college student at Cornell University when her psychiatrist prescribed her Lamictal (the brand name version of the active ingredient lamotrigine) as a mood stabilizer.

4.     By July 2018 – six months later – the lamotrigine had caused Rachel to develop an uncontrollable, painful rash covering nearly her entire body.  She had developed Stevens-Johnson Syndrome, Toxic Epidermal Necrolysis, and Hemophagocytic Lymphohistiocytosis – deadly diseases that Lamictal and its generic equivalents cause.

5.     On August 17, 2018, seven months shy of her twenty-second birthday, Rachel died.

6.     Lamictal and its generic equivalents are unreasonably dangerous products that can cause horrific side-effects like those Rachel experienced.  Glaxo, Lamictal's manufacturer and the company responsible for warning about the drug's risks, knew or should have known this – the science linking Lamictal and its generic equivalents to Stevens-Johnson Syndrome, Toxic Epidermal Necrolysis, and Hemophagocytic Lymphohistiocytosis was clear.

7.     The Glaxo defendants, however, have significantly profited from sales of Lamictal to do anything other than push sales of Lamictal as hard as they could, especially as a potential savior for people struggling with bipolar disorder.

8.     This was not a new strategy for Glaxo, which had illegally promoted Lamictal — including through the use of kickbacks — as a treatment for people with bipolar disorder even before it gained FDA approval to do so.

9.     While the science was clear on the link between Lamictal and deadly diseases, the science about the efficacy of treating bipolar disorder with Lamictal is much more muddled. In fact, the Glaxo defendants have relied for years on their own hand-picked, Glaxo-funded studies and scientists to support the proposition that Lamictal is an effective treatment for bipolar disorder.

10.     Glaxo has buried clinical trials with negative results in summary review articles they knew or should have known would not be read by most practitioners.

11.     The result was the following dynamic: Glaxo misrepresented the efficacy of Lamictal and its generic equivalents to treat bipolar disorder while, at the same time, failed to adequately warn about the lethal risks faced by people taking Lamictal.

12.     The dynamic resulted in a windfall for Glaxo, as sales of Lamictal skyrocketed and company profits soared.   But that dynamic also led to Rachel's tragic death because misinformation and misrepresentations prevented psychiatrists, like Rachel's, from adequately weighing the risks and benefits of prescribing Lamictal, or adequately warning her about the drug's risks.

13.     This action seeks to hold Glaxo responsible for that tragic death.

14.     This case will establish that Lamictal is an unreasonably dangerous drug, and that Glaxo was instrumental in promoting its use for treatment of bipolar disorder, even though the efficacy of such treatment was far from clear.  Furthermore, Glaxo promoted Lamictal to the medical community without adequate warnings and misled the medical community about the risks and benefits of Lamictal as a treatment for bipolar disorder.

15.     Had Glaxo acted appropriately and responsibly as the law requires, Rachel would not have been harmed by this dangerous drug.

16.     On or about October 9, 2018, the plaintiff, Alan Doran, was appointed Administrator for the Estate of Rachel Hope Doran, Deceased, by Probate Court of Westport, District No. 50.  A copy of said appointment is attached hereto as Exhibit A.

17.     Plaintiff Alan Doran is the Administrator of the Estate of Rachel Hope Doran (Deceased). Mr. Doran resides in Westport, Connecticut. Mr. Doran brings this lawsuit on behalf of his daughter Rachel's estate, who died due to complications from taking one of Lamictal's generic equivalent, lamotrigine, and brings this action against Defendants GlaxoSmithKline plc and GlaxoSmithKline LLC for damages and other such relief deemed just and proper.

18.     Defendant GlaxoSmithKline plc is a public limited company, incorporated under British law, with headquarters in Brentford, England. GlaxoSmithKline plc was formed in 2000 by the $76 billion merger of Glaxo Wellcome plc and SmithKline Beecham plc.  It has operational headquarters in Research Triangle Park, North Carolina, and in Philadelphia, Pennsylvania. At all relevant times, Defendant GlaxoSmithKline plc was engaged in Connecticut in the testing,

manufacturing, labeling, marketing, distributing, promoting, or selling of pharmaceutical drugs including Lamictal.

19.     Defendant GlaxoSmithKline LLC, a Delaware limited liability company, is the United States subsidiary of GlaxoSmithKline plc. GlaxoSmithKline LLC is the successor of SmithKline Beecham Corporation. GlaxoSmithKline LLC had headquarters in Research Triangle Park, North Carolina, and in Philadelphia, Pennsylvania. At all relevant times, GlaxoSmithKline LLC was engaged in Connecticut in the testing, manufacturing, labeling, marketing, distributing, promoting, or selling of pharmaceutical drugs including Lamictal.

## I.     FACTUAL BACKGROUND

### A.     Lamotrigine, the Active Ingredient in Lamictal and its Generic Equivalents, is Known to Cause Hemophagocytic Lymphohistiocytosis.

20.     In December 1994, the FDA approved lamotrigine (brand name Lamictal)[1] for use as an adjunctive therapy in specific subpopulations of patients suffering from epilepsy: adults with partial seizures, and children and adults with Lennox-Gastaut syndrome.

21.     On June 30, 2003, the FDA granted Glaxo's supplemental new drug application ("NDA"), approving Lamictal for the treatment of bipolar I disorder – a specific subclass of bipolar disorder reserved for patients who experience at least one manic episode.[2]

22.     Lamotrigine has always raised serious safety concerns.

23.     For example, in September 2006, the FDA highlighted safety concerns regarding the possible association between lamotrigine exposure during pregnancy and oral clefts in newborns. In May 2009, lamotrigine headlined a FDA safety alert detailing a rise in suicidal thoughts and behavior in patients recently starting the medication. And, in August 2010, the FDA raised concerns regarding the potential association between lamotrigine and inflammation in the lining of the brain (aseptic meningitis).

24.     One of the most serious risks associated with lamotrigine is Hemophagocytic Lymphohistiocytosis.

i.     Hemophagocytic Lymphohistiocytosis ("HLH")

25.     Hemophagocytic Lymphohistiocytosis describes a wide array of related life-threatening conditions in which the body's infection-fighting immune system is excessively activated.

26.     HLH is the consequence of a severe, uncontrolled hyperinflammatory reaction.

---

[1] Lamictal refers to a brand name drug manufactured, distributed, and marketed by Glaxo. Lamotrigine refers to the active ingredient in Lamictal. Some studies and data about the efficacy (or lack thereof) of Lamictal refer to the effects of lamotrigine, because that is the active ingredient being tested. For the sake of clarity, this Complaint occasionally references lamotrigine in that same manner.

[2] In contrast, a diagnosis of Bipolar II disorder is restricted to patients who have *never* experienced a manic episode.

3

27.     HLH is associated with a host of dangerous clinical features, including fever, reduction in the number of mature blood cells (cytopenia), liver injury and swelling (hepatosplenomegaly), lymph node disease (lymphadenopathy), and impaired blood coagulation (coagulopathy).

28.     The severe inflammation caused by HLH throughout the body can lead to hospitalization and death.

ii.     Lamotrigine – the active ingredient in Lamictal and its Generic Equivalents – is a known cause of HLH.

29.     Lamotrigine can cause patients to develop HLH.

30.     On April 25, 2018, the FDA issued a Drug Safety Communication ("DSC") warning that lamotrigine use was linked to HLH.

31.     As a result, the FDA required a new warning about the risk of HLH to be added to the label of Glaxo's brand name version of lamotrigine, Lamictal.

32.     Glaxo knew, or should have known, of the risk HLH posed by lamotrigine well before April 2018.

**B.     Glaxo is Legally Responsible for Warning about Lamictal and Their Generic Equivalents' Risks.**

33.     Given the clear science linking lamotrigine to HLH, the Glaxo defendants were responsible for ensuring they provided adequate warnings about those risks on its Lamictal label. But Glaxo did not meet their obligation to adequately warn of Lamictal's risks.

34.     In addition to that responsibility, Glaxo was also legally responsible for the labels on Lamictal's many generic equivalents, under what is called the "sameness requirement" for generic drugs.

35.     Federal law – the Food, Drug, and Cosmetic Act of 1938 ("FDCA") – requires that brand name drug manufacturers receive approval from the FDA before marketing a new drug for a particular use.  Among the requirements necessary for approval under the law is that the manufacturer must demonstrate to the FDA that the drug is safe and the proposed drug label is accurate.[3]

36.     A brand name manufacturer's obligation does not end after FDA approval.  To the contrary, a brand name manufacturer is obligated to monitor a drug's risks post-approval, and the law allows a mechanism by which brand name manufacturers can update drug labels to add or strengthen an instruction or warning on a supplemental basis even before the FDA approves it.

37.     The rules for *generic* manufacturers are different.  Under the Hatch-Waxman amendments to the FDCA, generic drugs can gain FDA approval simply by showing equivalence

---

[3] The relevant requirements are outlined in 21 U.S.C. § 355(d).

to a reference listed drug that has already been approved by the FDA. However, generic manufacturers are *prohibited* from unilaterally making changes to their labels. To the contrary, generic manufacturers are simply responsible for ensuring that their warning labels are the same as the brand name's label.

38.     The end result of this "sameness requirement" is that a brand name manufacturers like Glaxo – are responsible for the warnings for both its brand name drugs and any generic equivalents that might be developed. That means that brand name manufacturers know that whatever they decide to include on their brand name label will be the label on each and every generic version of their drug that is prescribed, sold, and used.

39.     As mentioned above, Lamictal is a brand name drug produced by Glaxo. The active ingredient in Lamictal is lamotrigine. There are many generic equivalents of Lamictal, including a version manufactured by TEVA Pharmaceuticals.

40.     For each of Lamictal's generic equivalents, Glaxo knew that the generic's labels would be the same as Lamictal's labels. As a result, it was foreseeable to Glaxo that any inadequacies of their Lamictal label would injure consumers of Lamictal's generic equivalents because those consumers would be relying solely on Glaxo's warnings.

41.     This is especially true because many patients who are prescribed Lamictal will often receive a generic version from their pharmacy. As discussed in detail below, that is exactly what happened to Rachel Doran, who was prescribed Lamictal by her doctor, but was given a Lamictal generic by her pharmacy.

42.     At each step, though, Glaxo knew or should have known that Rachel and her doctor were relying on the Glaxo defendants' warnings.

**C.     Glaxo Significantly Profited from Lamictal as a Result of Their Illegal and Aggressive Marketing Tactics.**

43.     What Glaxo also knew for sure was that their brand name version of lamotrigine – Lamictal – was a major profit center for the company.

44.     Glaxo is one of the world's largest pharmaceutical companies. As of 2018, Glaxo employed nearly 100,000 people, delivered 2.3 billion packs of medicine, and made $42 billion (£30.8 billion). Glaxo has a market capitalization of $97 billion. The United States is its largest single commercial market, representing 39 percent of its total revenue.

45.     Glaxo's size and revenue has made Glaxo powerful. One way Glaxo exercises that power is through lobbying. For example, in 2017 and 2018 – when Rachel Doran was dying from Lamictal use – Glaxo spent more than $8.7 million on lobbying in the United States.

46.     In order to maintain such massive revenues, Glaxo relies on developing and marketing what are known as "blockbuster" drugs. "Blockbusters" are drugs that generate annual sales of at least $1 billion.

47.     Lamictal has long been a blockbuster or near-blockbuster product for Glaxo. As early as 2003, Glaxo boasted in a press announcement that Lamictal was approaching "blockbuster status" with sales reaching nearly $1 billion. Lamictal sales increased from there. For the twelve months ending March of 2008, Glaxo's sales of Lamictal tablets in the United States exceeded $2 billion. And, as recently as 2017, Glaxo's sales of Lamictal exceeded $800 million.

48.     Glaxo established Lamictal as one of its "blockbusters" through aggressive marketing and advertising of Lamictal. That marketing and advertising included illegal conduct – ensuring Lamictal became (and remained) a financial juggernaut for the company was simply too important.

            i.       <u>Whistleblower Lawsuits Reveal Campaign of Illegal Marketing and Kickbacks to Maintain Profitability of Lamictal</u>.

49.     The FDA approved Lamictal as a treatment for bipolar I disorder on June 20, 2003.

50.     However, Glaxo heavily marketed Lamictal for the treatment of bipolar disorders well before the FDA approved Lamictal for that use, as well as for non-FDA-approved uses.

51.     For example, Glaxo directed employees to record after making contact with certain physicians that the physicians had "inquired about bipolar disorder." This tactic was designed to circumvent the requirements of the FDCA with regards to disseminating literature concerning non-approved uses and facilitated Glaxo's aggressive promotion of Lamictal to treat bipolar I disorder even before it had received FDA approval to do so.

52.     In addition, the 2001 Glaxo Selling Resource Guide for Lamictal provided scripts for sales representatives to address requests for information on Lamictal and bipolar disorder, indicating that there were numerous inquiries into this unapproved use.

53.     Not only did Glaxo aggressively market Lamictal for bipolar I disorder before they had received FDA approval to do so, but they also marketed Lamictal for uses they have never received FDA approval for.

54.     While the terms "bipolar," "bipolar depression," and "depression" are often used interchangeably by lay persons, there are unique variations of bipolar disorder, including:

- **Bipolar I disorder**: Involves at least one manic episode with or without a hypomanic or depressive episode;

- **Bipolar II disorder**: A milder form of bipolar depression characterized one or more episodes of hypomania and major depression (but no history of mania);

- **Cyclothymic disorder**: a milder form of bipolar disorder, present for greater than two years, characterized by prolonged dysthymia and hypomania;

- **Mixed bipolar disorder**: Manic or hypomanic episodes with additional features of depression; and

- **Rapid-cycling bipolar disorder**: disorder characterized by four or more episodes of mania, hypomania and major depression during a 12-month period.

55.     While the FDA approved Lamictal for use to treat bipolar I disorder in June 2003, it has never approved Lamictal for use for bipolar II disorder, cyclothymic disorder, mixed bipolar disorder, or rapid-cycling bipolar disorder.

56.     That did not stop Glaxo from marketing Lamictal as broadly as possible and off label.  For example, Glaxo distributed an educational alert to their sales employees discussing the use of lamotrigine as an augmentation agent in highly resistant (refractory) depression (also known as treatment-resistant depression ("TRD")), a use for which they have never received approval.

57.     Glaxo's policy was clear: aggressively push Lamictal as much as possible, to secure and expand on their "blockbuster" status.

58.     In October 2011, the United States filed a criminal complaint against Glaxo, alleging that Glaxo had "engaged in a fraudulent scheme to deceive and defraud physicians, patients, federal health care programs to cause prescribing and payment for certain of GKS's drugs" – including Lamictal.

59.     The complaint alleged fraudulent conduct on the part of Glaxo that included "publishing and promoting false and misleading accounts of studies," "misrepresenting clinical evidence," and using a "wide variety of gifts, payments and other forms of remuneration to induce physicians to prescribe GSK's drugs, including trips to Bermuda and Jamaica, spa treatments and hunting trips, and sham consulting fees."

60.     On July 2, 2012, Glaxo pleaded guilty to this criminal conduct and agreed to pay a $3 billion fine for its fraudulent conduct.

61.     Glaxo also entered into a civil settlement agreement to resolve claims brought by various *qui tam* relators alleging fraudulent marketing practices with respect to multiple drugs, including Lamictal.  The settlement agreement – which required Glaxo to pay a more than $54 million to cover their Lamictal-specific fraud – stipulated that during the period January 1, 1999 through December 31, 2003, Glaxo knowingly:

- Promoted the sale and use of Lamictal for a variety of conditions other than those for which it was approved as safe and effective by the FDA (including bipolar depression, neuropathic pain, and various other mental diseases);

- Made and/or disseminated unsubstantiated and/or false and/or misleading representation or statements about the safety and efficacy of Lamictal; and

- Offered and paid illegal remuneration to health care professionals to induce them to promote and prescribe Lamictal.

**D.     Glaxo Purposely Understated Lamictal and its Generic Equivalents' Risks to Protect Their Profits and Prevented Physicians from Adequately Warning**

**Patients.**

62.     While aggressively pushing Lamictal as a treatment for bipolar disorder, Glaxo intentionally made it impossible or more difficult for clinicians to adequately weigh the risk and benefits of prescribing Lamictal to patients suffering from bipolar disorder.

63.     Glaxo did this in two ways.  First, Glaxo overstated the efficacy of Lamictal and buried negative studies about its use as a treatment for bipolar disorder.  Second, Glaxo's label did not adequately and timely warn clinicians about the risks of Lamictal, specifically with respect to HLH, even as they became aware of the nature and severity of the risks posed by the drug.

> i.     Glaxo Overstated the Efficacy of Lamictal and its Generic Equivalents as a Treatment for Bipolar Disorder.

64.     Lamictal's profitability for Glaxo has obscured the fact that the science supporting its use as a treatment for bipolar I disorder is built on a house of cards.

65.     The story of Lamictal's alleged efficacy in treating bipolar I disorder cannot be told without discussing Dr. Joseph R. Calabrese of Cleveland, Ohio.

66.     Dr. Calabrese was Glaxo's greatest proponent for the use of Lamictal to treat bipolar disorder – beginning well before the FDA approved Lamictal for that purpose.

67.     In 1999, Dr. Calabrese published the first major study purportedly demonstrating that lamotrigine was an effective treatment for patients with bipolar I disorder: "A Double-Blind Placebo-Controlled Study of lamotrigine Monotherapy in Outpatients With Bipolar I Depression."

68.     This study, which claimed that "Lamictal was an effective treatment for bipolar disorder," was funded by Glaxo.

69.     A study a year later published by Calabrese reached the same conclusion.  "A Double-Blind, Placebo-Controlled, Prophylaxis Study of Lamotrigine In Rapid-Cycling Bipolar Disorder," J. Calabrese et al.  This study was also funded by Glaxo.

70.     Dr. Calabrese's work was central to Glaxo's promotion of Lamictal as a treatment for bipolar disorder.  In fact, even before the FDA approved the off-label use of Lamictal for bipolar I disorder, Glaxo sales representatives routinely discussed and distributed reprints of Dr. Joseph Calabrese's studies.

71.     Sales representatives at Glaxo were expected to read and be familiar with Dr. Calabrese's theories and statistics.

72.     Subsequent FDA approval of Lamictal's off-label use for bipolar I patients relied on these Glaxo-funded studies.

73.     The true clinical data, however, is much more complicated.

74.     As part of a legal settlement with the State of New York, Glaxo posted on its website nine studies that investigated the efficacy of lamotrigine in treating bipolar disorder. Of those studies, only two – Study SCAB2003 and SCAB2006 – had positive results while six had negative results.

75.     Five clinical trials with negative results – put on Glaxo's website only after legal action – were not published as individual papers, so clinicians and researchers could not independently evaluate the results.

76.     Instead, Glaxo funded a brief summary publication of the five negative studies that provided little actual data from the negative studies.

77.     This obfuscation is a common approach in deceptive drug marketing. As explained by research psychiatrists specializing in depression and bipolar illness in *Publication Bias and the Pharmaceutical Industry: The Case of Lamotrigine in Bipolar Disorder*, "The practice of burying negative data in infrequently read review papers seems to be one approach to 'publishing' such data, as exemplified by the single Glaxo-sponsored review paper which briefly summarized 5 negative studies with limited detail."

78.     Glaxo utilized this approach when they hid numerous relevant clinical trials about Lamictal's effectiveness from researchers and clinicians. As the *Publication Bias* authors explain:

> "Many clinicians and academics widely view lamotrigine as an effective treatment for, colloquially, 'bipolar depression,' even though the entire literature is less consistent on this point than many clinicians and academics appear to assume. ***This impression has been furthered by the selective publishing one of the RCTS with a positive secondary outcome…without emphasizing its negative outcome on the study's primary outcome***." (emphasis added).

79.     The problem is self-reinforcing. Numerous review papers purportedly investigating the effectiveness (or lack thereof) of lamotrigine for patients with bipolar disorder cite only the trials Glaxo permitted to be published as evidence of benefit of lamotrigine in acute bipolar depression but make no mention of the unpublished studies.

80.     Not surprisingly, the main trial Glaxo decided to publish and rely on – and the study that numerous review articles continually rely upon – was a study led by Glaxo's preferred researcher, Dr. Calabrese. The other two trials Glaxo felt comfortable publishing were also by Dr. Calabrese.

81.     Not only did Glaxo heavily rely on Dr. Calabrese's studies to aggressively push Lamictal as a treatment for bipolar disorder, but they also used his studies to quell concerns from psychiatrists of Lamictal's risks.

82.     The result was that Glaxo mischaracterized the data supporting the efficacy of Lamictal as a treatment for bipolar disorder. They marketed and highlighted articles conducted by their company-funded researcher, Dr. Calabrese, while burying negative studies that would have provided much needed context to researchers and clinicians alike. This meant that psychiatrists

were left unable to adequately evaluate the risks and benefits of prescribing Lamictal, because they would overvalue the positive effect Lamictal would have for patients with bipolar disorder.

        ii.      Glaxo Further Obfuscated the Risk/Benefit Analysis by Failing to Adequately Warn of Lamictal's Risks.

83.      Glaxo further manipulated the information available to clinicians and consumers seeking to evaluate the risks and benefits of Lamictal by failing to adequately warn about Lamictal's risks.

84.      As of at least 2017, Glaxo knew or should have known about the causal relationship between Lamictal and its generic equivalents and HLH. However, at the time Rachel was initially prescribed Lamictal, Glaxo's label did not mention – let alone warn about – HLH.

85.      Glaxo was or should have been aware of the nature and severity of these risks even after receiving initial FDA approval, and therefore was obligated to update its warning label accordingly. Glaxo chose not to do so.

86.      The result was that doctors like Dr. Parvez, Rachel's psychiatrist, and consumers like Rachel, were left fundamentally uninformed about the nature and severity of the risks associated with prescribing and taking Lamictal or its generic equivalents.

**E.    Rachel's Lamictal Story**

87.      In March 2017, Rachel Doran was a 20-year-old sophomore at Cornell University majoring in fashion management. Rachel sought treatment from the Cornell mental health office beginning in late March. Over the course of the next two semesters, Rachel received mental health care from Cornell.

88.      By December, Rachel was back home to Westport, CT. Rachel made an appointment with a local psychiatrist, Dr. Rizwan Parvez. Dr. Parvez evaluated Rachel for the first time on December 12th and 13th. Based on Rachel's constellation of symptoms and medical history, Dr. Parvez believed that Rachel was likely suffering from a bipolar mood disorder.

89.      After that initial evaluation, Dr. Parvez prescribed Rachel Lamictal to treat her bipolar mood disorder. Rachel filled the prescription at a local Walgreens. The pharmacy filled her prescription with a Lamictal generic manufactured by TEVA Pharmaceuticals.

90.      On July 12, 2018, Rachel went to a walk-in clinic in New York City, with symptoms of mucosal irritation, including pink eye and a sore throat.

91.      Rachel then presented to the Bridgeport Hospital Emergency Room at 2:50 a.m. on July 13. There, she developed a rash on her face, back, and chest, as well as blistering on her lips.

92.      Rachel was released from the hospital but returned on that same day after she began to experience difficulty swallowing and urinating. She developed a diffuse skin rash that was painful and itchy as well as mouth sores and facial swelling. Her lips began to crack, and she exhibited an intense infection of the eye conjunctiva.

93.     By roughly 6:00 p.m. that evening, Rachel's doctors determined that her symptoms were consistent with SJS/TEN, and she was transferred to the hospital's burn unit, where she remained for several days.

94.     On July 28, Rachel was transferred from Bridgeport Hospital to Columbia Presbyterian Medical Center for further management as her condition became increasingly dire. At Columbia Presbyterian she suffered from fevers, splenomegaly, elevated ferritin levels, which are conditions related to HLH.

95.     Rachel's condition kept deteriorating, and she suffered new and painful injuries in addition to SJS/TEN/HLH, including but not limited to:

- Acute respiratory distress syndrome;

- Pneumothorax;

- Renal failure;

- Maculopapular lesions throughout her face, trunk, genitals and thighs;

- Uncontrollable pain;

- Left cerebellar stroke with hemorrhage;

- Deep vein thrombosis;

- Leukocytosis;

- Lactic acidosis;

- Acute kidney injury;

- Persistent shock; and

- Multi-organ failure;

- Pain and suffering;

- Psychological, physiological, neurological and death sequelae; and

- Death

96.     Rachel also underwent numerous invasive and painful procedures as part of her diagnosis and treatment.

97.     But these invasive and painful interventions were futile. With her family by her side, Rachel died at 10:13 p.m. on August 17, 2018.

98.     As a result of her death, Rachel Doran has been permanently deprived of her ability to carry on and enjoy life's activities and her earning capacity has been permanently destroyed.

99.     As a further result of her death, the Estate of Rachel Doran incurred expenses for medical care and treatment and funeral costs all to its financial loss.

### COUNT ONE:

### ALAN DORAN, ADMINISTRATOR FOR THE ESTATE OF RACHEL HOPE DORAN (DECEASED) v. GLAXOSMITHKLINE PLC and GLAXOSMITHKLINE LLC

### (CPLA, Conn. Gen. Stat § 52-572m, et seq.)

100.    Plaintiff incorporates and realleges all allegations contained above as fully set forth herein.

101.    The Glaxo defendants are product sellers and are liable to Plaintiff under the CPLA, Conn. Gen. Stat. § 52.-572m *et seq.*, for innocent, negligent and/or willful failure to provide adequate warnings to Plaintiff about the risks associated with taking Lamictal and/or its generic equivalents and for placing an unreasonably dangerous product into the stream of commerce.

102.    At all times relevant, Glaxo owed a duty to warn consumers and their health care providers of the risks, dangers, benefits, and adverse effects of its bipolar depression drugs. Because generic manufacturers of Lamictal were bound by law to follow Glaxo's warning, this duty extended to consumers of generic versions of Lamictal.

103.    Glaxo marketed, promoted, distributed and sold a dangerous and defective prescription drug, Lamictal, to health care providers empowered to prescribe and dispense Lamictal and/or its generic equivalents, to consumers including Plaintiff without adequate warnings and misled the medical community about the risks and benefits of taking Lamictal and/or its generic equivalents to treat bipolar depression.

104.    Prior to 2017, Glaxo failed to provide timely and adequate warning to prescribers, distributors, lamotrigine ANDA holders, and consumers, including Rachel Doran and her physicians, of Lamictal's risk of causing HLH in the following ways:

- Glaxo knew or should have known of adverse reporting demonstrating that Lamictal and/or its generic equivalents caused HLH;

- Glaxo knew or should have known of the increased likelihood that patients like Rachel, who were prescribed Lamictal and/or its generic equivalents, would develop HLH;

- Glaxo knew or should have known that HLH is an aggressive and life-threatening syndrome of excessive immune activation;

12

- Glaxo knew or should have known that psychiatrists prescribing Lamictal and/or its generic equivalents, like Dr. Parvez, would not have known or appreciated the increased risk that Lamictal and/or its generic equivalents could cause HLH and would not be aware of the nature and potential harm associated with HLH;

- Glaxo's label for Lamictal and/or its generic equivalents did not include an HLH warning;

- The cost and difficulty of adding a warning about the risk of HLH – a warning which Glaxo has now added at the FDA's direction—would have been negligible;

- Rachel developed HLH as a result of taking Lamictal's generic equivalent, and HLH was a substantial factor in causing Rachel's death;

- Had Glaxo properly warned Rachel's prescribing psychiatrist Dr. Parvez about the risk of Lamictal and/or its generic equivalents causing HLH, Dr. Parvez probably would not have prescribed Lamictal and/or its generic equivalents; and

- Had Glaxo properly warned Rachel that Lamictal and/or its generic equivalents could cause HLH, Rachel probably would not have taken Lamictal and/or its generic equivalents and would not have been injured as described herein.

105. The Glaxo defendants' actions described above were performed willfully, intentionally, and with reckless disregard for the life and safety of both Plaintiff and the public.

106. As a result of the Glaxo defendants' conduct, Plaintiff's estate suffered those injuries and damages as described with particularity, above.

107. The Glaxo defendants are the brand name manufacturers and suppliers of the prescription drug Lamictal. Glaxo placed Lamictal into the stream of commerce in a defective and unreasonably dangerous condition such that the foreseeable risks exceeded the benefits associated with the design and/or formulation of Lamictal when used as Glaxo intended.

108. Glaxo knew or should have known that Lamictal and/or its generic equivalents were unreasonably dangerous because of the severity of the danger it posed to cause HLH that often lead to death. Glaxo exaggerated the effectiveness of Lamictal and/or its generic equivalents as a treatment for bipolar depression while drastically underselling the risk of developing HLH from taking Lamictal and the severity of the harm associated with developing HLH.

109. The result was that prescribing physicians were unable to adequately weigh the risks and benefits of prescribing Lamictal and/or its generic equivalents to patients suffering from bipolar depression.

110. Because Glaxo overstated Lamictal's effectiveness as a treatment for bipolar depression, and because of the other pharmaceutical options to treat bipolar depression that are widely available, Lamictal and/or its generic equivalents' inherent risks are not justified by any supposed societal benefits of Lamictal and/or its generic equivalents.

111.    The Glaxo defendants' failure to properly warn about the severity of the risks associated with Lamictal and/or its generic equivalents and exaggeration of the effectiveness of Lamictal and/or its generic equivalents as a treatment for bipolar depression was a substantial factor in the decision to prescribe Lamictal to Rachel Doran.

112.    Had Glaxo properly warned about the severity of the risks associated with Lamictal and/or its generic equivalents and not repeatedly exaggerated the effectiveness of Lamictal and/or its generic equivalents as a treatment for bipolar depression, Rachel Doran would not have taken Lamictal and/or its generic equivalents.

113.    As the direct and proximate cause of the defective condition of Lamictal as manufactured and/or supplied by Glaxo, and of the Glaxo defendants' negligence, carelessness, and other wrongdoing and actions described herein, Rachel Doran's estate suffered those injuries and damages as described with particularity, above.

114.    Glaxo is also liable to Plaintiff for negligent misrepresentation under CPLA, Conn. Gen. Stat. §52-572m, *et seq.* for innocent, negligent, and/or willful misrepresentation regarding the safety, efficacy, and/or risk/benefits of Lamictal and/or its generic equivalents to Rachel Doran and to heath care providers that prescribed Lamictal to her.

115.    In particular, both Dr. Parvez, the psychiatrist who prescribed Lamictal to Rachel, and Rachel Doran justifiably relied on the information provided by Glaxo regarding the efficacy and safety of Lamictal and/or its generic equivalents. As a result of their reliance on the misleading information proffered by Glaxo, Dr. Parvez prescribed, and Rachel Dora took, Lamictal and/or its generic equivalents.

116.    As a result of the Glaxo defendants' conduct, Plaintiff's decedent suffered those injuries and damages as described with particularity, above.

117.    Plaintiff is entitled to punitive damages pursuant to CPLA, Conn. Gen. Stat. §52-572m, *et seq.* because the Glaxo defendants' failure to warn was reckless and without regard for public safety and welfare. Glaxo misled both the medical community and the public-at-large, including Plaintiff's decedent, by falsely representing the safety of Lamictal and/or its generic equivalents. Glaxo downplayed, understated, and ignored their knowledge of the catastrophic risks associated with the use of Lamictal and/or its generic equivalents.

118.    Glaxo was or should have been in possession of evidence demonstrating that Lamictal and/or its generic equivalents caused serious side effects including HLH and the extreme severity of those side effects. Nonetheless, Glaxo continued to market its products by providing misleading and incomplete information about the risks and benefits of taking Lamictal and/or its generic equivalents.

119.    The Glaxo defendants' actions demonstrated a reckless disregard and indifference to the safety of others, including Plaintiff, and are therefore liable for compensatory and punitive damages to be awarded at trial.

**WHEREFORE**, the plaintiff claims:

1.    Compensatory damages;

2.    Punitive Damages;

3.    Attorneys' Fees;

4.    Costs; and

5.    The Court enter such other relief as is deemed just and appropriate.

THE PLAINTIFF,
ALAN DORAN, ADMINISTRATOR OF
THE ESTATE OF RACHEL HOPE
DORAN

JOSHUA D. KOSKOFF
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
TELEPHONE NO. (203) 336-4421
FAX NO.   (203) 368-3244
JURIS NO.   032250

A TRUE COPY
ATTEST:
CHARLES J. FISHER, JR.
STATE MARSHAL, HARTFORD COUNTY
AN INDIFFERENT PERSON

15

RETURN DATE:  OCTOBER 5, 2021      :      **SUPERIOR COURT**

**ALAN DORAN, ADMINISTRATOR**   :     **JUDICIAL DISTRICT**
**FOR THE ESTATE OF RACHEL HOPE**  :     **OF FAIRFIELD**
**DORAN (DECEASED)**              :

**V.**                                 :      **AT BRIDGEPORT**

**GLAXOSMITHKLINE PLC, ET AL**   :     **AUGUST 12, 2021**

## STATEMENT OF AMOUNT IN DEMAND

The amount of money damages claimed is greater than Fifteen Thousand Dollars ($15,000.00), exclusive of interest and costs.

THE PLAINTIFF,
ALAN DORAN, ADMINISTRATOR OF
THE ESTATE OF RACHEL HOPE
DORAN

JOSHUA D. KOSKOFF
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 FAIRFIELD AVENUE
BRIDGEPORT, CT 06604
TELEPHONE NO. (203) 336-4421
FAX NO.  (203) 368-3244
JURIS NO.  032250

# EXHIBIT A

| ˜FIDUCIARY'S PROBATE CERTIFICATE PC-450  REV. 7/15 | STATE OF CONNECTICUT |
|---|---|
| | COURT OF PROBATE |

| COURT OF PROBATE,  Westport Probate Court | DISTRICT NO. PD50 | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>RACHEL HOPE DORAN, late of Westport, in said District, deceased   (18-0321) | | DATE OF CERTIFICATE<br><br>August 3, 2021 |

| FIDUCIARY'S NAME AND ADDRESS<br><br>Alan Doran, 5 Maple Lane, Westport, CT 06880 | FIDUCIARY'S POSITION OF TRUST<br><br>Administrator | DATE OF APPOINTMENT<br><br>October 9, 2018 |
|---|---|---|

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

**This certificate is valid for one year from the date of the certificate.**

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

**Court Seal**

*Karen M. Uccellini*
Karen M. Uccellini, Assistant Clerk

## NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED